LUKE VINCENT LOCKWOOD, as Executor, etc., of RICHARD A. CANFIELD, Deceased, Respondent, *v.* NEW YORK LIFE INSURANCE COMPANY, Appellant.

First Department, November 17, 1916.

Insurance — life insurance — agreement between insured and insurer constituting novation.

Where an insured, under a policy written on the so-called insurance bond, accumulation plan, with a twenty-year accumulation period, having obtained from the insurance company a cash loan on the pledge of the policy, desired to surrender the policy for its value in cash less the loan, and the company, although the policy did not provide for the payment of cash for its surrender, agreed by letter to make such 'payment and drew a check for the required amount, but before its delivery the insured met with an accident from which he died, his executor is not entitled to recover under the policy, because the agreement by which the company consented to make the payment constituted a novation and all rights under the policy as such came to an end.

SMITH, J., dissented, with opinion.

APPEAL by the defendant, New York Life Insurance Company, from a judgment of the Supreme Court in favor of the

plaintiff, entered in the office of the clerk of the county of New York on the 5th day of January, 1916, upon the decision of the court after a trial before the court, a jury having been waived.

*James H. McIntosh* of counsel [*Louis H. Cooke* with him on the brief], for the appellant.

*Robert L. Redfield* of counsel [*Richard P. Lydon*, with him on the brief], for the respondent.

CLARKE, P. J.:

On December 5, 1899, the defendant issued its policy No. 997,228, insuring the life of Richard A. Canfield, and therein agreed, in consideration of the payment of the sum of $7,579 and a like sum on the fifth day of December in every year during the continuance of the policy until twenty full years' premium should be paid, to pay an amount not to exceed $124,000, as specified in a table contained therein, upon receipt and approval of proofs of Canfield's death.   Thereafter the annual premium was duly reduced to $7,277.

The policy was written on what was called the insurance bond, accumulation plan, with a twenty-year accumulation period, and in addition to insurance and loan benefits it provided for participation in the profits of the defendant if the insured was living and the policy in force on the 5th of December, 1919.

The amount of insurance payable in the event of death gradually decreased with the age of the policy from $124,000 during the first seven years to $117,500 during the twentieth year.

The policy provided for loans as follows: " Cash loans can be obtained on the sole security of this Insurance Bond on demand at any time after this Bond has been in force two full years, if premiums have been duly paid to the anniversary of the Insurance next succeeding the date when the Loan is made.   Application for any Loan must be made in writing by the Insured to the Home Office of the Company, and the Loan will be subject to the terms of the Company's loan agreement.   The amount of Loan available at any time is stated in Column 2 below, and includes any previous Loans then unpaid.   Interest will be at the rate of five per cent per annum in advance."

The amount of loan available gradually increased with the age of the policy from $13,400 after the expiration of the second year to $117,500 after the expiration of the nineteenth year.

On the 7th day of January, 1914, said Canfield obtained from defendant a cash loan of $79,452 on the pledge of the policy as security therefor, as evidenced by his loan agreement. In the loan agreement Canfield agreed to pay interest at five per cent in advance to the next premium payment date of the policy, namely, December 5, 1914, and · annually in advance thereafter, and he further agreed to pay the amount of said loan when due, with interest, reserving the right to reclaim the policy by repaying the loan with interest at any time before due, but the loan did not become due and payable unless there was default in the payment of premium or interest, " or, (1) on the maturity of the policy as a death claim or an endowment; (2) on the surrender of the policy for a cash value; (3) on the selection of a discontinuing option at the end of any dividend period. In any such event the amount due on said loan shall be deducted from the sum to be paid or allowed under said policy."

A few days before December 5, 1914, Canfield called at the defendant's home office and saw the defendant's second vice-president, John A. McCall, and told him that he wished to confer with him about his policy. Mr. McCall then referred Canfield to defendant's assistant secretary, Wilbur H. Pierson. Canfield stated to Pierson that he desired, if possible, to have the twenty-year accumulation period under the policy shortened to a fifteen-year period or, if the defendant was unwilling to do this, he desired to surrender the policy for its value in cash. He asked Pierson to write him and tell him exactly what the defendant would do. On December 7, 1914, Pierson, as requested by Canfield, wrote to him as follows:

" I have consulted with the Officers of the Company with reference to shortening the dividend period of your policy to 15 years, and I find this cannot be done now for the reasons I stated to you during your recent visit to this office. The present cash surrender value of your policy is $89,900, from which amount the outstanding loan would be deducted."

On December eighth Canfield wrote to Pierson as follows:

" I have your note stating surrender value of my policy to be

$89,900. Also that the company cannot recognize my request for a dividend period of 15 years.

" I am disappointed at the decision, and am unable to see the equity of refusing to a client who has paid 15 premiums, what you would give had he paid but 14.

" As a matter of plain finance, my policy has no value now. Any value it may have had, has been gradually lost as the 15 years passed. To pay 5 years more premiums with the 15 years interest on a premium, would compel me to pay more money by far than I would get, and I would also lose my principal, as explained to you. Therefore, I will thank you to send me a check for the surrender value of my policy, less my loan from the company."

The $89,900 offered for the policy " less my loan from the company " left a net sum of $10,448.

On December ninth, after receiving Canfield's letter of December eighth, the company wrote to him as follows:

" Concerning the payment of the surrender value of your policy.

" Company's check in payment of the full cash value of your policy will be ready for delivery to you to-morrow, at such time as you may designate. If you prefer to come to the home office, check will be held here awaiting your call. If you prefer to have it delivered to you and will call me on the 'phone indicating the time suiting your convenience, we will have a representative of this Department call upon you, tender the check and obtain your release."

And thereupon on December ninth the defendant drew a warrant for its check for $10,448 to the order of Canfield, and on the morning of December tenth drew its check to his order, which said check was received in defendant's division of policy claims at ten-thirty A. M., for said sum, and at the same time, on its records, marked said policy canceled as purchased for its cash surrender value, and also marked said loan as paid and satisfied out of said cash surrender value.

Canfield did not call at the defendant's office or communicate further with it after Pierson's letter of December ninth to him. On the afternoon of December tenth he met with an accident from which he died December eleventh, while the

check was still in defendant's hands. December twelfth defendant mailed the check to him which check came into the hands of the plaintiff, who is Canfield's executor, and was returned by his attorney in a letter to the defendant. Defendant immediately returned the check to plaintiff's attorney and plaintiff's attorney then wrote the defendant that the check was held subject to its order.

On January 21, 1915, plaintiff furnished due proofs of Canfield's death and demanded payment of the policy, but the defendant duly returned the proofs of death and denied any liability except for the sum of $10,448, agreed to be paid for the surrender of the policy, and thereafter this suit was brought upon the policy.

On December 5, 1914, there was due the annual premium, $7,277, and a year's loan interest in advance, $3,972.60, and Canfield had not paid any part thereof. If he defaulted in these payments, the pledge of the policy would be foreclosed in accordance with the terms of the loan agreement, and the loan satisfied in the manner provided in the policy. But the policy allowed a month's grace for premium payment, subject to an interest charge of five per cent, and if Canfield had not been satisfied with the defendant's offer he could still within the month of grace pay the premium and loan interest and continue the policy in force.

The policy did not provide for the payment of cash for its surrender. It was only in the event all premiums were paid, the policy in force, and Canfield living December 5, 1919, that the policy gave him the right to surrender it and receive its value in cash. Under the loan provision of the policy, no loan was obtainable thereon unless the premiums were duly paid to the anniversary date next succeeding the date when the loan was made; and too, loan interest was payable in advance. If either premium or loan interest was not duly paid, the defendant had a right under the loan agreement to foreclose the pledge of the policy and satisfy the loan out of the value of the policy in the manner provided therein.

The agreement, therefore, by which the company consented to satisfy its loan, cancel the policy and pay $10,448, was a new and independent contract outside of the terms of the

policy and in substitution therefor. It constituted in my opinion a novation and all rights under the policy, as such, came to an end.

In *Bandman* v. *Finn* (185 N. Y. 508) the defendant Finn in May, 1902, became the purchaser of certain premises and executed to one Schmidt, the broker, an agreement by which he agreed to pay $1,000 on the passing of the title and the additional sum of $8,600 on the completion of the roof on the contemplated building on said premises, and in the event of a sale of those premises $8,600 on consummation of said sale. In October, 1903, no building having been erected on the premises and the defendant not having sold the same, Schmidt retained a lawyer, Mr. Levy, to negotiate with the defendant for a satisfaction and surrender. Finally the negotiations terminated on Monday in an oral agreement whereby the defendant promised to pay Schmidt the sum of $2,500 on the Wednesday following and Schmidt agreed to execute to the defendant a release of all his claims and to surrender to him the agreement. The parties met at the time and place appointed and the defendant offered to carry out the contract. Schmidt had not with him the written agreement which was to be surrendered. On the defendant requiring the production of the agreement Schmidt went away with the ostensible purpose of procuring it. He never returned, but refused to carry out the contract. Thereafter the defendant sold the premises, and after the consummation of that sale, Schmidt having assigned his contract, the assignee brought suit for $8,600. At the conclusion of the evidence plaintiff requested the court to direct a verdict for $8,600, the full amount claimed under the agreement, and the defendant for the sum which he had agreed to pay therefor. The court directed a verdict for the plaintiff for $2,500. Chief Judge CULLEN said: " The testimony in the case tended to show, we may say conclusively showed, for it was uncontradicted, that on Monday there was effected a complete oral agreement by which, on the Wednesday following, the defendant was to pay Schmidt $2,500, and Schmidt was to surrender the agreement and release his claim.   *   *   *   But the plaintiff insisted that the case is one of accord and satisfaction, and till executed had no binding force, and either party was at liberty to withdraw

from it.   This was the view entertained by the Appellate Division in setting aside the verdict, the learned trial court having directed the verdict on the ground that the new contract entered into between the parties operated as a novation and discharged the liabilities under the old contract.   I am of opinion that the trial court was correct.   *   *   *   At the time of the agreement between the parties in November, 1903, there had been no breach of the written contract with the defendant.   Under that contract he was obligated to pay only in one of two contingencies, on the completion of the roof of the contemplated building on such premises, or in case of a sale of the same by the defendant.   Neither of these contingencies had occurred.   Therefore, the situation was that of a creditor holding an unmatured and contingent obligation, agreeing with his debtor for the surrender of the obligation.   Even in the case of a claim unmatured, but not contingent, the payment and receipt of a less sum than that specified is a full satisfaction of the larger claims not yet due.   (*Brooks* v. *White*, 2 Metc. 283; *Bowker* v. *Childs*, 3 Allen, 434.)   As is said in the cases it may be much more advantageous to the creditor to obtain the money before it is due, and this is sufficient consideration for receiving a smaller sum.   So, also, it has been held that an executory agreement for such a surrender or compromise will be enforced.   *   *   * .
The plaintiff's assignor having at the time of the second agreement no cause of action against the defendant, I do not see why he could not enter into a valid agreement with the defendant for the transfer and surrender of the latter's obligation to the same extent as he might have done with any third party.   *   *   *   The agreement in the present case was not tentative but specific and final.   The defendant agreed to pay, and the plaintiff agreed to receive, a specific sum at a specified time and place.   Had the defendant defaulted in the performance of his agreement, the plaintiff's assignor could have sued on his promise regardless of the merits of the claim under the original contract.   Equally the defendant may hold the plaintiff's assignor to the agreement."

So, in the case at bar.   The obligation of the company to pay prior to the making of the new agreement was entirely contingent.   Canfield had no present right of action and no

enforcible claim.   The policy contained no provision for its surrender before December 5, 1919.   The company was not obliged to pay Canfield any sum in cash for the surrender of his policy nor could it compel him to accept cash for it and surrender it, and Canfield, on the other hand, was not obliged to surrender his policy for cash nor could he compel the defendant to pay him cash for it except on surrender.   Canfield desired to drop the policy and realize what he could on it, and, therefore, he asked the defendant to make him an offer for its purchase and surrender.   If the company's cash offer for its surrender was not satisfactory Canfield still had the option to continue the policy by the payment of the December 5, 1914, premium, with interest thereon, and loan interest at any time within the month's period of grace.   Not having paid the December 5, 1914, premium and loan interest, Canfield was not then under the policy's terms entitled to any further loan whatever.   To be sure the surrender value agreed upon was less than the amount that would have been payable in the event of his death, but death was a contingency which might not happen during the life of the policy; and, beside, the net benefit available in the event of death was gradually decreasing and would eventually be entirely wiped out.

Canfield's right to discontinue the policy for its cash value at the end of the twenty-year period was contingent on his being then alive and the policy then in full force, and he himself figured that the policy was of no present value to him and that if he carried it to the end of the period he would pay out more than he would receive.

The agreement for the policy's surrender was of benefit and advantage to both parties in that they substituted a present obligation to pay a fixed and definite amount in place of another amount which was at once unmatured, indefinite and contingent.

It seems to me, therefore, that by the letters which passed between the parties, namely, upon the request of Canfield, an offer made by the company and an acceptance in writing by him, followed immediately by the action of the company in drawing its check and canceling its policy, there was a complete novation and that the executor can only recover upon the new

contract voluntarily entered into in his lifetime by his decedent. It follows, therefore, that the defendant having sent to the plaintiff a check in compliance with the terms of said new contract for the full amount due, which is still in his possession, the judgment appealed from and certain of the findings in the decision should be reversed and new findings made and the complaint dismissed upon the merits, with costs to the appellant.

LAUGHLIN, SCOTT and PAGE, JJ., concurred; SMITH, J., dissented.

SMITH, J. (dissenting):

Under the policy in question, after the expiration of fourteen years, Canfield was entitled to a loan of $89,900; after the expiration of fifteen years he was entitled to a loan of $97,800. The policy also provides that after the policy has been in force for two full years, "if premiums have been duly paid to the anniversary of the insurance next succeeding the date when the loan is made," the policyholder is entitled to those loans. This policy was dated the 5th day of December, 1899. Canfield died on the 11th day of December, 1914. So that between the 5th day of December, 1914, and the 11th day of December, during which these negotiations were pending, fifteen years had expired. It is clear that in order to obtain a loan of $97,800 the premium must have been paid for another year. If, however, upon the 4th day of December, 1914, Canfield had applied for a loan of $89,900 he would have been entitled thereto upon the payment of interest upon that loan for a single day. It may fairly be claimed that the requirement that the premium must be paid to the next succeeding aniversary date would be construed to apply in the case in question to the loan of $97,800, and that Canfield was entitled upon the 5th or 6th day of December, 1914, to the loan of $89,900 without the payment of the premium for the year commencing December 5, 1914. This would amount to the surrender value in case the premium was not paid within the thirty days' grace allowed by the statute. It is probably true that from the instrument itself the right to borrow $89,900 upon December 5 or 6, 1914, without paying the sixteenth premium due upon the policy might be doubtful, but the defendant itself has put a practical interpretation upon

the contract by which, in my judgment, it is concluded upon this question. In the letter of December seventh the assistant secretary writes to Canfield: "The present cash surrender value of your policy is $89,900, from which amount the outstanding loan would be deducted." This letter does not purport to grant to Canfield any rights not given in his policy, but to recognize existing rights. If this letter were not forceful as a practical interpretation of the contract it would doubtless bind the company as an estoppel, because it is upon this letter that Canfield indicated his choice to accept this surrender value.

If, then, Canfield had the right to this money under the contract as the surrender value of the policy there was no consideration for his election to accept the same, and until the money was paid and accepted he might withdraw his election. Before the money was paid he died, and the policy, I think, remained in full force. I, therefore, vote for affirmance.

Judgment reversed, with costs, and complaint dismissed upon the merits, with costs. Order to be settled on notice.